# IN THE SUPREME COURT OF IOWA

No. 11–1214

Filed August 16, 2013

**STATE OF IOWA,**

    Appellee,

vs.

**DESIRAE MONIQUE PEARSON,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Des Moines County, Cynthia H. Danielson, Judge.

A juvenile challenges her sentence as cruel and unusual under the State and Federal Constitutions. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and N. Nan Jennisch and David Arthur Adams, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, Patrick C. Jackson, County Attorney, and Tyron T. Rogers, Assistant County Attorney, for appellee.

**APPEL, Justice.**

Seventeen-year-old Desirae Pearson was convicted by a jury of two counts of first-degree robbery and two counts of first-degree burglary for her actions at two separate homes on Thanksgiving night in 2010. The district court sentenced her to serve concurrent sentences for the convictions arising from each transaction—one count of first-degree robbery and one count of first-degree burglary—but ordered those two sentences be served consecutively. Because each first-degree robbery conviction carries a sentence of twenty-five years imprisonment subject to a seventy percent mandatory minimum, Pearson received a fifty-year sentence and will be ineligible for parole until she serves thirty-five years. Pearson argues her sentence is cruel and unusual as applied to her under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. For the reasons expressed below, we vacate Pearson's sentence and remand the case to the district court for further proceedings.

## I. Background Facts and Prior Proceedings.

Pearson was born in August 1993. According to her presentence investigation report, when she was six or seven years old, Pearson was hit by a car and hospitalized for several days. Though subsequent neurological and psychiatric testing did not reveal any particularized concerns, Pearson's parents believed they saw changes in her behavior following the accident, especially with regard to anger management.

Prior to her arrest in the present matter, Pearson arguably had a penchant for simple misdemeanor theft and engaging in physical altercations. In 2002, she entered into an informal adjustment

agreement following an allegation of fifth-degree theft.[1]  In 2003, she was alleged to have engaged in assault and fifth-degree theft, but her case was held open for further review.  In 2004, she was alleged to have engaged in an assault, but she was warned and her case was dismissed. In 2006, she received a warning after allegedly engaging in disorderly conduct.  She also entered into a second informal adjustment agreement following an allegation of fifth-degree theft.  In 2007, she was adjudicated delinquent for disorderly conduct following a fight with a fellow classmate at school.  In 2008, she entered into her third informal adjustment agreement following an allegation of assault.  Finally, in 2009, she was alleged to have engaged in disorderly conduct, again by fighting, but she was warned and her case was dismissed.  Importantly, though Pearson has been the subject of frequent law enforcement intervention, prior to her arrest in the present matter she had only been adjudicated delinquent one time and had never been the subject of an adult criminal proceeding.

At the time of her arrest, Pearson lived with her parents, her two sisters, and her two young nephews.  She has two older brothers and two older stepsiblings who lived outside the home.  Her father's police record contained two convictions for operating while intoxicated.  Her mother's record was clean.  Pearson's parents perceived her as one who "is angry and fights," but indicated she is a "smart girl" they would like to see remain at home to finish high school and have a career.  Pearson's parents perceived that Pearson has a discipline problem.  They resorted to grounding her as a method of punishment.

---

[1]Under Iowa Code section 714.2(5), theft of property not exceeding $200 in value is fifth-degree theft.  It is classified as a simple misdemeanor.  Iowa Code § 714.2(5) (2001).

Prior to her arrest, Pearson was in eleventh grade at the local alternative high school. The presentence investigation report indicated Pearson spent much of her free time "running around with her friends." She indicated that many of her friends were negative influences, and she claimed they were a significant reason she got into trouble. While Pearson did not acknowledge having a drug problem, she admitted to smoking marijuana daily as well as taking prescription drugs during the year prior to her arrest. Though she does not believe she has an alcohol problem, she admitted to consuming alcohol on the day of her arrest. A predisposition report in a previous juvenile court matter indicated, however, that in 2008 evaluators at the University of Iowa hospitals diagnosed Pearson with mild to moderate child-onset conduct disorder, alcohol abuse, cannabis abuse, mathematic disorder, and a reading disorder.

On November 25, 2010, Pearson and her boyfriend, Devon Lukinich, armed themselves with BB guns that looked like handguns and went on a robbery spree in Burlington and West Burlington. At the time, Pearson was seventeen years and three months old. Lukinich was also approximately seventeen years old. Pearson and Lukinich wore bandanas to conceal their faces and gloves to guard against leaving fingerprints. Pearson also wore a parka with a fur-lined hood pulled over her head.

Around 9:15 p.m., Pearson and Lukinich were allegedly involved in an altercation with a Burlington resident that led to a 911 call. Though Pearson and Lukinich had fled the scene by the time police arrived, the resident relayed information about Pearson's vehicle to police, who then put out the description of the vehicle to officers in the area.

Around 9:45 p.m., Pearson and Lukinich knocked on the door of Zachary Moore. When Moore opened the door, Pearson pointed her BB gun at Moore and told him that he was being robbed. Lukinich then informed Moore that Pearson was not joking and that he would shoot him if Pearson would not. Lukinich told Moore he was looking for the "weed money" as well as two individuals. Moore testified he laid on the floor while the pair took his laptop, television, iPod, a handheld videogame game system, a small global positioning device (GPS), and some cash.

After reconnecting his landline telephone, which had been disconnected by Pearson and Lukinich when they rummaged through his apartment, Moore called the police. When police arrived, Moore found his cell phone with the battery disconnected on his front step. Moore testified he believed Lukinich was in control of the robbery because Lukinich checked the other rooms of Moore's home while Pearson sat on the couch, was the one who unhooked the television, and was the only one who spoke after they entered the apartment.

Pearson and Lukinich returned home to unload their loot.[2] The pair lived in the basement of a house owned by Lukinich's mother's boyfriend. Pearson and Lukinich then went to a McDonald's, where they purchased strawberry milk shakes.

Later that night, Pearson and Lukinich entered the home of Joan Wright, an eighty-one-year-old woman, and her son, Ronald Wright. At the time, Joan was in bed and Ronald was in the basement. Lukinich climbed through a kitchen window and opened a door for Pearson.

---

[2]Police later recovered Moore's iPod and laptop in the basement but as of the time of the trial they had not recovered his television. No mention was made at trial as to the recovery of the portable gaming system or the GPS.

Pearson took cash out of a purse that was sitting on the kitchen table. The pair also took three pill bottles containing prescription medication. Lukinich then went into an unoccupied bedroom, while Pearson stood in the hallway just outside the doorway. After hearing noises and seeing the shadows of people she did not recognize, Joan got out of bed to investigate. She saw Lukinich in her son's bedroom, holding Ronald's two shotguns in their cases. Lukinich told Joan to go back to her bedroom, and Pearson told Joan to do as she was told. Lukinich and Pearson then opened their jackets, revealing the BB guns. When Joan yelled to her son that they were being robbed, Lukinich pushed her backward into a doorframe. The force of the blow fractured her shoulder. Lukinich decided to take one of Ronald's shotguns, and the pair left the home. Police responded to the Wrights' home around 11:44 p.m.

Just moments after they left the Wrights' home, police apprehended Pearson and Lukinich in their car. At the time, Pearson was driving. After securing warrants to search the vehicle, police found pill bottles bearing the names of Joan and Ronald. They recovered Ronald's shotgun and cash matching the amount stolen from Moore and Joan. They also discovered two BB guns, BBs, two bandanas, a stocking, and two pairs of gloves. When the officers first viewed the BB guns in the trunk of the vehicle, the officers thought the weapons were real handguns. One of the BB guns bore a strong resemblance to a Glock model 30 handgun and the other to a Taurus PT 1911 handgun.

On May 4, 2011, a jury found Pearson guilty of first-degree robbery and first-degree burglary for her actions at Moore's house. The jury also

found her guilty of first-degree robbery and first-degree burglary for her actions at the Wrights' house.[3]

Roughly two weeks later, Pearson wrote a letter to the district court in which she admitted the facts of each crime in substantially the same way they were presented at trial. According to Pearson, she took some pills, "chilled" at home for a while, and went to her family's house. She and Lukinich then shoplifted two stores before Lukinich suggested they go to an elderly woman's home, presumably for the purpose of committing a theft. While they were hiding in the bushes outside the woman's home, Pearson wrote, Lukinich saw someone in Pearson's car. Pearson stated they yelled at the man and started shooting at his house. They got into the car and, as they pulled away, a man came out of a house with a gun. Lukinich leaned out the window and continued firing shots.

According to Pearson, Lukinich then suggested going to another house where marijuana was located. Pearson indicated that Lukinich told her to knock on the door, that she told the person who answered the door (Moore) "to get down," and that Lukinich stated he would shoot the man if she would not. Pearson admitted to taking cash and a laptop while looking for marijuana. She stated Lukinich stole the television and the iPod. She then admitted to dropping the stolen items off at home before going to McDonald's to get strawberry milk shakes.

After driving around for some time, the pair stopped to check out another house (the Wrights'). Pearson wrote that Lukinich climbed through a window and unlocked the door for her, that they took some pills and cash from the kitchen, and that although she told Lukinich

---

[3]The jury found Lukinich guilty of the same crimes.

they should leave, he started to look through another room. Pearson recounted how Joan confronted them, how Lukinich told Joan to go back to bed, how she repeated Lukinich's statement to Joan, and how Lukinich showed Joan his weapon. Pearson stated she started to leave before hearing stumbling and observed Lukinich behind her. Pearson then noted their car was stopped moments later by police.

After expressing remorse for her actions, the victims, and her family, Pearson admitted that she deserved punishment for her conduct, but requested that she receive a lesser sentence than the maximum she was facing. She wrote, "I always thought that going to prison could not happen to me because I would never do anything serious enough for it to happen." Pearson continued, "I know now it can happen to anyone if you don't think before you act, if you are under the influence, and if you think you won't get caught."

In mid-July, Pearson wrote a second letter to the district court. In this letter, Pearson stated she was "not the person who committed those crimes" because at the time she "was influenced and on drugs." Pearson asked for "a second chance to live [her] life other than behind bars." She also expressed remorse for the victims and asked for "another punishment instead of spending 25 years in prison."

Pearson and Lukinich appeared for sentencing on July 22. Ronald Wright gave an impact statement in which he stated his mother spent two months in rehab following surgery. He also expressed his opinion that Pearson and Lukinich should receive at least half of their potential total sentence. A victim coordinator read Joan Wright's impact statement aloud. Joan's statement informed the district court that her injuries sustained during the robbery required the implantation of a metal plate in her shoulder, secured by twenty to twenty-five screws and

pins.[4] Joan's statement reiterated that she spent two months in the hospital and a nursing home following surgery and indicated she still experienced pain in her arm. Joan stated that she suffered from worsening vision problems because she missed an eye appointment following her shoulder surgery, that she was still frightened to be left alone at home, and that she missed taking flowers to her mother's grave on Christmas because she was in the nursing home. The victim coordinator read a similar statement from Moore, who indicated that he was still negatively affected by the events of the robbery and that he believed Pearson and Lukinich should receive life sentences.

The State asked the district court to order concurrent sentences for Pearson for the robbery and burglary at Moore's home and concurrent sentences for the robbery and burglary at the Wrights' home. The State further requested that the sentences stemming from each transaction run consecutively to result in a total of fifty years.

Pearson's attorney acknowledged the mandatory minimums and argued Pearson should be sentenced to concurrent sentences totaling twenty-five years. Pearson's attorney cited the United States Supreme Court's statements that juveniles are less deserving of the most severe punishments due to their lessened culpability and that juveniles "must have some meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." Pearson's attorney argued that if Pearson was released on parole after serving 17.5 years, the mandatory minimum of a twenty-five-year sentence, she would be more likely to be able to contribute to society in a meaningful way than she

---

[4]At trial, Joan's surgeon testified that Joan would not regain full strength or full mobility in her shoulder.

could if released in her fifties. When the district court asked Pearson for her statement, she replied that she did not have anything to say other than what she included in her written statement to the court.

In sentencing Pearson to fifty years, the district court found that while her file reflected a troubled family life, a troubled history, the lack of a support structure, and negative influences, these circumstances did not justify her criminal actions. The court considered Joan's serious injuries and the fact that the victims did not feel safe in their homes. The court emphasized Pearson and Lukinich had "thrown their futures away," stating, "It's a tragedy in terms of your futures. There is no doubt that it's a waste of your lives, but it's the unalterable choice that you have made."

The district court continued,

> I understand the argument that as young people you may not have had wisdom and the ability to distinguish what the result of your actions were going to be, but it doesn't diminish in any way the results of your actions.

The district court then observed Pearson had prior experience with the court system, stating, "[T]he court system has been trying for years to provide Miss Pearson with the support, the education, the training, the life skills necessary to turn her life around. She hasn't done so."

The district court found Pearson had committed a series of bad choices. The court recognized that Pearson was one month shy of her eighteenth birthday at the time of sentencing and that her record indicated five curfew violations as well as a number of other matters processed by the juvenile court system. It further noted that she had been expelled from the traditional school system in ninth grade, that she worked at McDonald's, and that she had parents and siblings in the area. The district court found that Pearson had a recurring issue with

assaults since the age of fourteen and that she and her family had been provided with numerous services to address and resolve underlying issues. The court expressed its belief that Pearson and others who wrote statements in her favor wanted to blame her friends, alcohol use, drug use, a bad family relationship, and poor parenting, but that "the bottom line is that you are responsible for your actions and you're responsible for your choices." The court continued, "What is clear is that you knew what you were doing, you understood the impact that it was going to have on your victims, and you did it."

The district court interpreted Pearson's second letter requesting a punishment other than a twenty-five-year sentence as asking for an alternative form of punishment to a prison sentence, to which it stated, "That's not the reality here. There is no alternative. The only question before the court today is whether the four sentences will run concurrently or consecutively." The court found Pearson's second letter signified Pearson did "not understand the significance of the crime that [she had] committed and the impact," based on the fact she had been repeatedly informed each conviction carried a twenty-five-year sentence.

The district court also expressed concern the judicial system was providing "repeated opportunities to young offenders to avoid the ramifications of their actions." The court continued, "I think people truly believe that anything you do prior to turning 18 is gone on your 18th birthday, and that's not the case." The court concluded granting four concurrent sentences on four class "B" forcible felonies "would imply that a criminal defendant can only receive one sentence regardless of the number or seriousness of their crime," which would "continue to send the wrong message to any other individuals considering committing criminal acts."

In addition, the district court acknowledged the Supreme Court's statements about juveniles with regard to their "immature decision-making and their ability to change and rehabilitate." The district court indicated its belief that juveniles should have "the opportunity to do those things, and the benefit of having some meaningful opportunity to ultimately be released."

Finally, after the court recognized that a potential release date is often a motivating factor to an inmate, it stated the primary purpose of Pearson's sentencing was protection of the public, not rehabilitation. The court stated, "I don't believe that the focus here today should be on the rehabilitation of the defendants, but rather the protection of society in these particular cases." The district court explained,

> The question of whether Miss Pearson will be able to contribute to society in any meaningful way is not really the issue that the Court finds determinative, particularly in the face of the fact that Miss Pearson has previously received any number of rehabilitation attempts in the past to set her on the correct path without success.

After sentencing Pearson, the district court concluded by saying it did not take the sentencing of juveniles to lengthy prison terms lightly. It also expressed its hope Pearson would take advantage of the rehabilitative and educational programs offered in prison so that she could ultimately return to the community at the appropriate time.

Pearson appealed, and we transferred her case to the court of appeals. The court of appeals upheld Pearson's sentence. The court of appeals determined Pearson's actions fell "squarely within the well-defined parameters" of the robbery statute. The court of appeals agreed with the findings of the district court that Pearson was nearly an adult when she committed her crimes, that she had a history of assaultive behavior, and that she had failed to take advantage of rehabilitative

opportunities. The court acknowledged Pearson would have to spend the majority of her life in prison, but held her sentence was not disproportionate to her crimes, finding the district court had properly considered Pearson's age.

We granted further review.

## II. Standard of Review.

A challenge to a sentence as illegal may be brought at any time. *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009). We review constitutional challenges to illegal sentences de novo. *Id.*

## III. Discussion.

**A. Positions of the Parties.** Pearson argues her sentence is unconstitutional as applied to her under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. Pearson notes that she was only seventeen years old at the time of the crimes and that under the district court's sentence, she is not eligible for parole until she is almost fifty-three years old. She argues the district court was not interested in rehabilitation, but rather solely in incapacitation. Pearson argues that she never took the lead in any of the robberies and that she took only minimal actions secondary to those of Lukinich, who threatened to shoot Moore, who was more active in looking for items to steal in the homes of Moore and the Wrights, and who pushed Joan Wright to the ground. She also cites her relationship with Lukinich and her obvious immaturity.

Pearson also argues a seventy percent mandatory minimum for first-degree robbery is not in line with other offenses subject to seventy percent mandatory minimums as applied to her. She asserts the aggregated seventy percent mandatory minimums lead to punishment far harsher than that imposed in other jurisdictions for similar crimes.

The State responds that the thirty-five-year minimum sentence is not grossly disproportional under the test outlined by the United States Supreme Court in *Rummel v. Estelle*, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980), *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), and *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (plurality opinion). The State argues that even if Pearson's case warrants an as-applied review, this court should defer to the legislature because the legislature is the "clearest and most reliable objective evidence of how our society views a particular punishment today." The State asserts Pearson's sentence is not grossly disproportionate to her crime because of the nature of the crimes which caused the victims fear and pain. The State points to Pearson's history with the juvenile justice system as support for the proposition that her sentence fits her crime. The State then turns to intrajurisdictional and interjurisdictional analyses, concluding Pearson has failed to establish either prong. The State further argues that to the extent Pearson has raised a claim under the Iowa Constitution, she fails to demonstrate her case is a "rare" case warranting an as-applied review. *See Bruegger*, 773 N.W.2d at 884.

**B. Analysis.** At the outset, we consider the applicability of the United States Supreme Court's approach in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), to Pearson's sentencing. In *State v. Null*, 836 N.W.2d 41 (Iowa 2013), also decided today, we explored in detail the contours of *Miller*, as well as the Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), and *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). We need not repeat the analysis here. In *Null*, we reversed a juvenile's sentence and remanded the case to the district

court for reconsideration in light of *Miller.* 836 N.W.2d at 86. On remand, we emphasized the district court must recognize that because " 'children are constitutionally different from adults,' they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing." *Id.* at 74 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418). We emphasized that if the district court believes an exception to this general rule applies, the district court should make specific findings. *Id.* In making such findings, we required the district court to "go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing." *Id.* at 74–75 (citing *Graham*, 560 U.S. at ___, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847, and *Roper*, 543 U.S. at 572–73, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24). We stated the typical characteristics of youth, such as immaturity, impetuosity, and poor risk assessment, are to be regarded as mitigating instead of aggravating factors. *Id.* (citing *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467–69, 183 L. Ed. 2d at 422–24).

In addition, we emphasized the district court must recognize that " '[j]uveniles are more capable of change than are adults' and that as a result, 'their actions are less likely to be evidence of "irretrievably depraved character." ' " *Id.* (quoting *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841). We noted that while some juvenile offenders might be irreparably lost, it is very difficult to identify those falling into that category and that even trained psychologists have difficulty making this type of prediction. *Id.*; *accord Graham*, 560 U.S. at ___, ___, 130 S. Ct. at 2026, 2029, 176 L. Ed. 2d at 841, 844; *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. "Because 'incorrigibility is inconsistent with youth,' care should be taken to avoid

'an irrevocable judgment about [an offender's] value and place in society.' " *Null*, 836 N.W.2d at 75 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422). Finally, in *Null*, a case involving a homicide, we indicated a very long prison sentence of more than fifty-two years without the possibility of parole should be "rare or uncommon." *Id.*

Here, the district court sentenced Pearson to consecutive terms totaling thirty-five years imprisonment without the possibility of parole. We think in light of the principles articulated in *Miller* and *Null* that it should be relatively rare or uncommon that a juvenile be sentenced to a lengthy prison term without the possibility of parole for offenses like those involved in this case. Otherwise, we would be ignoring the teaching of the *Roper–Graham–Miller* line of cases that juveniles have less culpability than adults, that the few youth who are irredeemable are difficult to identify, and that juveniles have rehabilitation potential exceeding that of adults.

Though *Miller* involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson's sentence of thirty-five years without the possibility of parole for these offenses. 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420 (concluding that nothing *Graham* "said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific"); *accord Null*, 836 N.W.2d at 65. Therefore, we think a minimum of thirty-five years *without the possibility of parole* for the crimes involved in this case violates the core teachings of *Miller*. We think the principles in *Miller* as developed by the Supreme Court in its Eighth Amendment jurisprudence are instructive on the resolution of this case. As in *Null*, we independently apply article I, section 17 of the Iowa Constitution,

adopt the principles underlying *Miller*, and apply them to the facts of this case. *See* 836 N.W.2d at 70 & n.7; *see also Bruegger*, 773 N.W.2d at 883–84.

We have no occasion to consider whether *Miller*'s principles must be applied to all juvenile sentences. Instead, we need only decide that article I, section 17 requires an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole for these offenses and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life.

Nothing in *Bruegger* is to the contrary. In *Bruegger*, we considered whether the sentence imposed upon an adult amounted to cruel and unusual punishment. 773 N.W.2d at 878–88. While the adult sentence was enhanced by juvenile adjudication, prevailing federal law, which Bruegger did not contest, emphasized that such sentences should be treated as adult sentences for adult crimes. 773 N.W.2d at 885–86. Further, though we indicated an as-applied challenge brought by an adult convicted of crime should be rare and described the circumstances that made Bruegger's case meet that demanding standard,[5] but we did not circumscribe or limit the types of as-applied challenges that may be made under the Eighth Amendment or article I, section 17 of the Iowa Constitution for adult convictions, let alone juvenile convictions, or indicate the factors considered were applicable in every case or exhaustive. *Id.* at 884–85. Certainly, nothing in *Bruegger* should be

---

[5]In *Bruegger*, the particular circumstances were a broadly framed underlying crime, Bruegger's young age when he committed the prior offense, and a geometric increase in penalty due to the enhancement resulting from the juvenile adjudication. 773 N.W.2d at 884–85.

read as contrary to the principles of the *Roper–Graham–Miller* trilogy with respect to sentences imposed as a result of juvenile convictions.

We also note that the district court here did not have the benefit of *Miller* or *Null* when it sentenced Pearson.  Our review of the district court's handling of Pearson's sentencing convinces us the district court did not consider the principles underlying *Miller*.  For example, the district court indicated it understood the argument that Pearson, as a young person, may lack the ability to appreciate the results of her actions, but then stated that argument "doesn't diminish in any way the results of [her] actions."  It is true that Pearson's youthfulness does not lessen the results of her actions insofar as the impact they had on the lives of the victims, yet under *Miller* and *Null,* a juvenile's culpability is lessened because the juvenile is cognitively underdeveloped relative to a fully-developed adult.  *Miller*, 560 U.S. at ___, ___, 132 S. Ct. at 2464–69, 2475, 183 L. Ed. 2d at 418–24, 430; *Null,* 836 N.W.2d at 74.  This lessened culpability is a mitigating factor that the district court must recognize and consider.  *Miller*, 560 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *Null,* 836 N.W.2d at 60.

The district court declared, "[T]he bottom line is that you are responsible for your actions and you're responsible for your choices."  The court further stated Pearson did "not understand the significance of the crime that [she had] committed and the impact."  While it is true that juveniles lack the maturity to fully understand the consequences of their actions, under *Miller* and *Null* this too is a mitigating factor.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468–69, 183 L. Ed. 2d at 422–23; *Null,* 836 N.W.2d at 60.  Again, the district court did not treat it as such.

Finally, the district court stated, "I don't believe that the focus here today should be on the rehabilitation of the defendants, but rather the

protection of society in these particular cases."  Yet, under *Miller*, *Graham*, and *Null*, rehabilitation is an important factor and to predict that a juvenile cannot be rehabilitated is very difficult.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *Graham*, 560 U.S. at ___, ___, 130 S. Ct. at 2026, 2029, 176 L. Ed. 2d at 841, 844; *Null*, 836 N.W.2d at 67; *see also Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.  The district court should have considered rehabilitation as a factor in sentencing Pearson.

In sum, the district court emphasized the nature of the crimes to the exclusion of the mitigating features of youth, which are required to be considered under *Miller* and *Null.*  Accordingly, we vacate Pearson's sentence and remand the case to the district court for application of the *Miller* standards as described in *Null* and this opinion.

Based on this disposition, it is unnecessary for us to address other arguments raised by Pearson in challenging her sentence.  We do not consider, for instance, whether the sentence would violate the proportionality concepts of *Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 549, 54 L. Ed. 793, 798–99 (1910), *Solem, Ewing*, or any other proportionality test that might be applied in this case or any other issue related to Pearson's sentencing.  These challenges are not ripe at this time and must wait until after the district court has resentenced Pearson.

**IV. Conclusion.**

For the above reasons, we vacate the sentence imposed by the district court and remand the case to the district court for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED.**

All justices concur except Cady, C.J., who concurs specially; and Mansfield, Waterman, and Zager, JJ., who dissent.  Zager, J., also writes a separate dissent.

**CADY, Chief Justice (concurring specially).**

I concur with the majority opinion but write separately to emphasize that, although the holding in this case is properly limited to its facts, neither the Supreme Court's opinion in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), nor our decisions today in *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013), and *State v. Null*, 836 N.W.2d 41 (Iowa 2013), express the full scope of the changing landscape of juvenile justice. This landscape should be observed by all judges and carefully considered when sentencing juvenile offenders as adults.

An obvious correlation exists between the life-without-parole context of *Miller* and *Graham*[6] and sentences that effectively deprive offenders of a meaningful opportunity for release in their lifetime. It comes as no surprise, then, that our decisions today recognize de facto life sentences very clearly exist. *See Ragland*, 836 N.W.2d at 109–26; *Null*, 836 N.W.2d at 45–87. Yet, applying the teachings of *Roper*,[7] *Graham*, and *Miller* only when mortality tables indicate the offender will likely die in prison without ever having the opportunity for release based on demonstrated maturity inadequately protects the juvenile's constitutional rights.

Indeed, limiting the teachings and protections of these recent cases to only the harshest penalties known to law is as illogical as it is unjust. In *Null*, we thoroughly examined recent advances in neuroscience, which illustrate the decreased culpability of the juvenile offender. *See Null*, 836

---

[6]*Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

[7]*Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

N.W.2d at 54–55. While this logic has been applied in the context of the death penalty and life-without-parole sentences, it also applies, perhaps more so, in the context of lesser penalties as well. After all, as the Court declared in *Miller,* nothing that *Graham* "said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific." *Miller,* 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420.

Nor could it be. As the background of this case demonstrates, a juvenile's impetuosity can lead them to commit not only serious crimes, but considerably pettier crimes as well. Although Desirae Pearson was a participant of a senseless evening of crime—all while stopping in the middle to enjoy a milk shake with her boyfriend—she also committed theft in the fifth degree at several other times during her youth. Can we honestly say, as a matter of law, that the transient immaturity of Pearson's youth played no part at all in the commission of these lesser offenses, decreasing her culpability? The answer, of course, is that we cannot.

Thus, the juvenile offender's decreased culpability plays a role in the commission of both grievous and petty crimes. Notably, even Chief Justice Roberts's dissenting opinion sensed *Miller*'s reasoning applies well beyond the context of homicide and calls into question a number of current practices, such as trying juveniles as adults and sentencing juveniles according to mandatory minimums. *See id.* at ___, 132 S. Ct. at 2482, 183 L. Ed. 2d at 437–38 (Roberts, C.J., dissenting). It may be natural to assume the stakes are simply lower regarding the latter category of crimes, but denying juveniles who commit lesser crimes the protections afforded in *Miller* denies them their rights under the Eighth Amendment and article I, section 17 of the Iowa Constitution no less

than denying a juvenile who commits a considerably more serious crime the very same protections.

The court's holding is limited to the bizarre facts of this case—both Pearson's senseless and violent, though nonhomicidal, crime spree and the district court's approach during sentencing. After all, Pearson somehow faced more time in prison without the possibility of parole than all offenders except a juvenile convicted of first-degree murder. *See* Iowa Code § 902.1(2) (Supp. 2011). Consequently, Pearson's constitutional claim prevails under even the narrowest step forward in our jurisprudence.

Thus, wisely, the decision today takes a modest, incremental step, one with which I totally agree. Yet, our understanding of adolescent neuroscience and our approach to juvenile justice are rapidly evolving. Children are indeed different for the purposes of criminal sentencing. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418 (majority opinion). The full breadth of the protections articulated in *Roper*, *Graham*, and *Miller*, as well as our own trilogy of cases we decide today, may yet reach further towards justice. We leave that conclusion for another day. In the meantime, these cases should be instructive to all judges today that the *Miller* factors should be applied to all juveniles sentenced as adults regardless of the crime. As the Attorney General's National Task Force on Children Exposed to Violence stated in a thoughtful and detailed policy recommendation: "We should stop treating juvenile offenders as if they were adults, prosecuting them as adults in adult courts, incarcerating them as adults, and sentencing them to harsh punishments that ignore their capacity to grow." Office of Juvenile Justice & Delinquency Prevention, U.S. Dep't of Justice, *Report of the Attorney General's National Task Force on Children Exposed to Violence*

§ 6.9, at 189 (2012). In other words, applying the teachings of *Miller* irrespective of the crime or sentence is simply the right thing to do, whether or not required by our Constitution.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent. The sentence in this case is a harsh one. Its severity results from a combination of two things: (1) the general assembly's decision to require persons who commit first-degree robbery to serve seventeen and one-half years in prison (or seventy percent of their twenty-five-year sentence) before being eligible for parole; and (2) the district court's decision to "box car" (or run consecutively) the two first-degree robbery sentences in this case.

The severity of this sentence is only partly related to the defendant's age. This sentence would have been harsh even if the defendant had been legally an adult, rather than just seventeen years and three months old, at the time she went on this crime spree with her eighteen-year-old boyfriend.

Needless to say, I am not a member of the general assembly, nor am I the trial judge. I do not get to decide the proper sentence in this case. In addition, the defendant has not argued that the district court abused its sentencing discretion.[8]

Thus, the only question before us is whether the sentence violates the United States or Iowa Constitution because it is "cruel and unusual." For the reasons stated herein, I agree with the court of appeals that the sentence is not so "grossly disproportionate" as to render it

---

[8]Another serious issue, not raised by Pearson on appeal, but touched upon in some of the correspondence with the district court, is that Pearson is African-American. Twenty-five percent of Iowa's prison population is African-American, as compared to 2.9% in the general population. Iowa Dep't of Human Rights, Div. of Criminal & Juvenile Justice Planning, *Iowa Prison Population Forecast FY 2011–2021* (2011), at 29, *available at* http://www.humanrights.iowa.gov/cjjp/images/pdf/Forecast2011.pdf. This is due in large part to the number of African-Americans serving "70 percent" sentences. *Id.* at 2.

unconstitutional.  *See State v. Oliver,* 812 N.W.2d 636, 650–51 (Iowa 2012) (citation and internal quotation marks omitted).

## I.  Some Key Facts.

The majority has accurately described the facts of this case. However, I would like to emphasize a few points.

The guns wielded by Pearson and her boyfriend Lukinich during the robberies appeared to be real handguns to the victims and initially to the police.  Only later when the police picked the guns up did they learn the guns were $CO_2$ powered BB guns.

The first robbery victim described a terrifying scene.  He opened the door; Pearson pointed one of the guns at him and told him he was being robbed.  Lukinich then pointed his own gun at the victim and said, "If she don't shoot you, I will."  The victim was forced to lie down on the floor while Pearson and Lukinich rummaged through the house and grabbed numerous items.

The main victim of the second robbery turned out to be an elderly woman.  While getting ready for bed, she heard noises in the night and went downstairs with her walker.  She was confronted by Pearson and Lukinich, both wielding what appeared to be handguns.  She yelled for her son who lived with her.  As soon as she called out, Lukinich pushed her against the wall, causing her shoulder to fracture in several places. Pearson and Lukinich then left the house with a shotgun, cash, and prescription medicine they had taken.

Both of these victims submitted written victim impact statements, which were read by the victim coordinator at sentencing.  The first victim stated, "I truly believe that they [Pearson and Lukinich] should both remain behind bars for the extent of my life and theirs."  The second victim asked that each of the defendants be imprisoned for fifty years.

The State requested consecutive sentences for each defendant on the two robberies.

The presentence investigation does not indicate that Pearson came from a troubled family background. Into her high school years, she lived at home with her parents, who had been married for the past twenty-three years. Her father was disabled and stayed at home during the day; her mother had been working for the same employer for the past twelve and one-half years. According to Pearson's juvenile court officer, "There are no concerns of them trying to cover up their daughter's negative behaviors. They are very concerned for Desirae's well being."

Pearson's juvenile record dates back to elementary school.[9] When she was fourteen, Pearson was expelled from her local high school for a serious assault on another female student. She received juvenile court services and a year later was allowed to return to that school. The following year, when Pearson was nearly sixteen, she was discharged from juvenile court services. She also began attending the alternative high school, which she was still attending at the time of her and Lukinich's crime spree. There are indications that Pearson regularly used marijuana and possibly alcohol and prescription drugs.

After Pearson was convicted of the two robberies (and two burglaries) arising out of these home invasions, and while she was awaiting sentencing, she wrote two letters to the judge. In the first letter, she confessed her crimes and requested "a lesser sentence than what I am facing." However, just before sentencing, Pearson sent the court

---

[9]As noted by the majority, Pearson's parents believed that her behavior changed after she was hit by a car when she six or seven years old and hospitalized for several days. However, the University of Iowa hospitals ran both neurological and psychiatric exams that did not detect anything amiss.

another, shorter letter in which she asked not to go to prison, i.e., "a second chance to live life other than behind bars."

The district court certainly was aware of Pearson's youth. In fact, Pearson's attorney briefed and argued *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). *Miller v. Alabama*, 567, U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), had not yet been decided. He urged that juveniles are "less deserving of the most severe punishments . . . more capable of change and less likely to show evidence of irretrievably depraved character than adults." He added that a juvenile offender "must have some meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." He concluded, "[T]he fact that juveniles tend to make immature decisions should influence the Court to sentence Miss Pearson to the minimum possible, which is still in my opinion a very large sentence of 25 years."

The district court commented on what it perceived to be Pearson's "troubled" family life and history, and "very negative influences" on her. It noted that efforts by the juvenile court system to rehabilitate her had apparently been unsuccessful. It also indicated that it did not believe *Graham* was applicable because "we are not discussing a life sentence for Miss Pearson." Ultimately, the court decided to make the robbery/burglary sentences for the second home invasion consecutive to the robbery/burglary sentences for the first home invasion. The district court commented, "I don't believe that the focus here today should be on the rehabilitation of the defendants, but rather the protection of society in these particular cases." It also pointed out the seriousness of the injuries to the second victim.

**II. Because This Case Does Not Involve a Sentence of Life Without Parole (LWOP) or Its Practical Equivalent, *Graham* and *Miller* Do Not Apply.**

As I've already indicated, I carry no particular brief for the sentence Pearson received in this case. Although it does not exceed what the State and the two main victims requested, it is longer than I would have imposed. But the district court is surely right: It is *not* a life sentence.

Any fair reading of *Graham* and *Miller* requires us to acknowledge this point. In *Graham,* the Court held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845 ("This Court now holds . . . ."). The Court went on:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

*Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. The Court made clear that it was establishing a "categorical rule." *Id.* at ____, 130 S. Ct. at 2032, 176 L. Ed. 2d at 848. But of course, Pearson falls outside the category. She will be eligible for parole when she is in her early fifties. She has a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846.

In *Miller,* the Court decided that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 ("We therefore hold . . . ."). The Court added that "[i]n imposing a State's harshest penalties, a sentencer misses too much if he

treats every child as an adult." *Id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 422–23. "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features . . . ." *Id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423. But *Miller* does not cover Pearson's circumstances either. She did not receive "a State's harshest penalt[y]," nor was her penalty "mandatory."

In short, *Graham* and *Miller* have a lot to say about youth and immaturity, much of which would be obvious anyway to an experienced Iowa trial judge. But they have nothing to say about *this* case, because it does not involve an actual or de facto life sentence. The observations about juvenile offenders in *Graham* and *Miller* are there only to justify restricting the most severe form of imprisonment—life without parole— for these offenders.

The majority here rewrites those cases. Yet it does not manage even to be consistent with today's decision in *State v. Null*, 836 N.W.2d 41 (Iowa 2013). In *Null*, the majority found that a sentence of 52.5 years before eligibility for parole fell under *Graham* and *Miller* because the mere "prospect of geriatric release" was insufficient. 836 N.W.2d at 71. Here, without adding much to what it said in *Null*, the court concludes that a sentence of thirty-five years before eligibility for parole falls under *Graham* and *Miller.* Pearson would be eligible for parole when in her early fifties, so the problem here is not "geriatric release," but that Pearson has been deprived of "the possibility of leading a more normal adult life." Thus, we now have two standards for when *Graham* and *Miller* apply. And for good measure, the majority fires a shot across the bow: "We have no occasion to consider whether *Miller*'s principles must be applied to all juvenile sentences." The first question a trial judge or

attorney might ask in the next juvenile offender case is, "Where does the law stand?"

Regardless of the outer limits of the majority's rulings, it is clear the court has now transformed *Miller* and *Graham* into a platform to potentially overturn hundreds of non-LWOP prison sentences imposed on juvenile offenders in Iowa. This would be unprecedented. While some jurisdictions have concluded that *Graham* and *Miller* apply to "de facto" life sentences where the defendant will not be eligible for parole until she is at or approaching her life expectancy, no other appellate court has adopted the majority's reading of those cases. The Iowa Supreme Court stands alone.[10]

For example, recently the Illinois Court of Appeals was confronted with a challenge to a lengthy prison sentence for a sixteen-year-old girl who had aided and abetted her twenty-year-old boyfriend in murdering an uncle who had molested her. *People v. Pacheco*, 991 N.E.2d 896, 898–99, 2013 WL 3193670, at *1 (Ill. App. Ct. 2013). The mandatory minimum was twenty years; the trial court sentenced the defendant to thirty years in prison. *Id.* at 903–04, 907–08, 2013 WL 3193670, at *7, *11. The court had little difficulty in concluding that the Supreme Court's line of cases was inapplicable. *Id.* at 898–99, 906–07, 2013 WL 3193670, at *1, *10.[11]

---

[10]In addition to the discussion here, I refer the reader to the out-of-state cases cited in part II of my dissent in *Null*.

[11]The court explained:

> [T]he Supreme Court in *Roper* [*v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)], *Graham*, and *Miller* was only concerned with the death penalty and life without the possibility of parole, which are the two most severe punishments allowed under the United States Constitution. We agree with the State "[i]t would be a great stretch to say that *Graham* meant to require legislatures and courts to treat youths and adults differently in every respect and every step of the criminal process."

In *People v. Perez*, the California Court of Appeal recently rejected a *Graham/Miller* challenge to consecutive mandatory minimum sentences for forcible lewd acts committed when the defendant was sixteen years old. 154 Cal. Rptr. 3d 114, 115, 118–21 (Ct. App. 2013). Under the overall sentence, the defendant would not be eligible for parole for thirty years, when he would be forty-seven years old. *Id.* at 120. Still, the court had no difficulty upholding the sentence because "[t]he central focus in the majority opinions [of the United States Supreme Court] was the fact the offenders had been exposed to the 'harshest' available sentence." *Id.* at 120–21. As the court put it, "[T]his is not an LWOP case. The state's most severe penalties are not at stake here." *Id.* at 121. The court added, "There is a bright line between LWOPs and long

---

As we have covered this topic in a broad manner, we now look at defendant's specific arguments.

. . . .

Defendant next argues the automatic imposition of any adult sentence on a juvenile defendant as a result of the automatic transfer statute violates the eighth amendment and the proportionate penalties clause. As stated earlier, when taken to its logical extreme, defendant's argument would make any statute unconstitutional which imposes on a juvenile transferred to adult court the same mandatory minimum sentence applicable to an adult for the same offense. We disagree.

Defendant reads *Roper*, *Graham*, and *Miller* too broadly. The Supreme Court did not hold in *Roper*, *Graham*, or *Miller* the eighth amendment prohibits a juvenile defendant from being subject to the same mandatory minimum sentence as an adult, unless the mandatory minimum sentence was death or life in prison without the possibility of parole. Defendant was sentenced to neither of these. The minimum 20-year term defendant faced in this case does not compare with the death penalty or a mandatory term of life in prison without the possibility of parole. The sentencing range applicable to defendant in this case is not unconstitutional pursuant to *Roper*, *Graham*, and *Miller*, and the sentence defendant received violated neither the eighth amendment nor the proportionate penalties clause.

*Pacheco*, 991 N.E.2d at 906–07, 2013 WL 3193670, at *10–11.

sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole." *Id.* at 119.

As the Colorado Court of Appeals recently stated:

> Lehmkuhl has cited no post-*Graham* decision, nor have we found one, that has determined that a sentence affording a defendant a chance to be paroled within his natural lifetime violates *Graham*'s requirement that defendants be given a meaningful opportunity to obtain release.

*People v. Lehmkuhl*, ___ P.3d ___, ___, 2013 WL 3584754, at *3 (Colo. App. 2013).

We can now look forward to a flurry of new proceedings as the State, defense attorneys, and our own judicial system sort through the unresolved issues raised by the majority opinion. For example, if a sentence of thirty-five years without parole implicates *Graham* and *Miller*, as my colleagues believe, then the current sentencing law governing juveniles who commit class "A" nonhomicide felonies would appear to be in constitutional jeopardy. That law was enacted by the legislature in 2011 *in response to Graham*. *See* 2011 Iowa Acts ch. 131, § 147 (codified at Iowa Code § 902.1(2) (Supp. 2011)). It provides that any juvenile who commits a Class "A" felony other than first-degree murder shall automatically receive a life sentence but shall be eligible for parole "after serving a minimum term of confinement of twenty-five years." *Id.* Certainly, a twenty-five year mandatory term of imprisonment would prevent the offender from "living a more normal adult life." If so, my colleagues seemingly have doomed one of our legislature's enactments.[12]

---

[12]The majority does not respond to the substance of this argument. Instead, in *Null*, citing yet another law review article, the majority dismisses it as a "slippery-slope-type argument." I believe the implications of a judicial decision are a fair topic for discussion.

We can get a good sense of how many new proceedings this decision could generate by looking at data from the Division of Criminal and Juvenile Justice Planning within the Iowa Department of Human Rights. According to these data, as of May 31, 2013, there were 425 inmates serving time in Iowa prisons for offenses committed before the age of eighteen. *See* Iowa Dep't of Human Rights, Div. of Criminal & Juvenile Justice Planning, *Current Inmates Under 18 at Time of Offense* (May 31, 2013), *available at* http://www.humanrights.iowa.gov/cjjp/ima ges/pdf/Prison_Population_Juveniles_05312013.pdf. Only thirty-six of these individuals had committed Class "A" felonies. *Id.* Thus, the vast majority of these individuals are serving prison terms of various lengths but not LWOP terms. Thanks to the current decision, they may now have a ticket to court and a potential resentencing.[13]

Of course, a court should not refrain from rendering a decision because it may have far-reaching effects. But before we kick start a process that could overturn approximately 400 prison sentences, and put ourselves at odds with every other state and federal appellate interpretation of *Graham* and *Miller*, we owe it to the public to explain clearly what we are doing and why the law requires it. The majority opinion falls short.[14]

---

[13]Some of these persons may have received term-of-years sentences that amount to de facto life sentences, as arguably occurred in *Null*, but I suspect that is not a large group.

[14]The majority tries to defend itself from the charge that it has muddied the waters by including a footnote in *Null* that muddies the waters even more. Thus, the majority points out that *Miller* does not achieve "certainty" because it does not foreclose LWOP. True enough, but irrelevant. The issue is not whether the law is "certain" in some absolute sense; that is unattainable. The issue is whether my colleagues have created *more* uncertainty by eliminating the bright-line rule in *Miller* that limits its application to LWOP sentences.

The majority is unable to improve upon its scant reasoning in *Null.* Again and again, *Miller* made clear that it was addressing life without parole sentences, described variously as "the most serious penalties," "the most severe punishments," "the harshest sentences," the "most severe penalties," "the law's harshest term of imprisonment," "this ultimate penalty for juveniles," "this lengthiest possible incarceration," "a sentence of life (and death) in prison," "a State's harshest penalties," "that harshest prison sentence," "this harshest possible penalty," and "the harshest possible penalty." *See* 567 U.S. at ___, 132 S. Ct. at 2460, 2464–69, 2475, 183 L. Ed. 2d at 414, 418–22, 424, 430. My colleagues simply ignore this limiting language, which the United States Supreme Court was careful to use throughout its opinion.

To be sure, the majority includes the same escape hatch as in *Null*—namely, that it is applying the principles of *Miller* under article I, section 17 of the Iowa Constitution. While this may protect the majority from having its reasoning reviewed by the United States Supreme Court, it fails to explain why all other state courts to apply the same principles have reached a different conclusion. As noted, one of the central principles of *Miller* is that it applies only to the most severe penalties. *Miller* did not constitutionalize every sentencing proceeding whereby a juvenile is sent to prison.

The concurrence in this case, while intended to bolster the majority opinion, only exposes its flaws. In a backhanded way, the concurrence expresses the view that *Miller* applies to all "lesser crimes"— not merely "lengthy" prison sentences or "consecutive mandatory minimum" sentences. Thus, the concurrence says,

> [D]enying juveniles who commit lesser crimes the protections afforded in *Miller*, denies them their rights under the Eighth Amendment and article I, section 17 no less than denying a

juvenile who commits a considerably more serious crime the very same protections.

But if "denying" *Miller* to a juvenile who commits a lesser crime violates the Eighth Amendment and article I, section 17, then *Miller* must apply to *all* juveniles who commit crimes. In any event, this novel and even broader interpretation of *Miller* only adds to the uncertainty engendered by the majority opinions in this case and *Null.* If the justices joining the majority in these two decisions cannot agree on what they stand for, how are the bench and bar to follow them?[15]

Also, the concurrence speaks of our "rapidly evolving" approach to juvenile justice and the "changing landscape of juvenile justice." I agree with these observations but draw a different conclusion from them. Elected officials are better situated than a state supreme court to reflect rapid developments and changing landscapes. Our court can only resolve particular cases that are brought to us. When we decide a case, we are limited to the record made by the parties before us; we do not have the benefit of input from other Iowans. And when we render a

---

[15]The concurrence says it would be "illogical" to limit *Miller* to the harshest penalties and cites Chief Justice Roberts's dissent in *Miller* for that point. But Chief Justice Roberts was making that point by way of criticizing the *Miller* decision as fundamentally wrong. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2482, 183 L. Ed. 2d at 437–38 (Roberts, C.J., dissenting). The *Miller* majority clearly indicated that a combination of *two* factors was necessary to render a punishment cruel and unusual: a crime committed by a youth and a sentence of life without parole. A reading of the case that focuses on youth alone rather than youth *plus* the harshest penalty is simply not faithful to the Supreme Court's opinion. That is why no other court has adopted it. In the words of the California Court of Appeal:

> [N]o high court has articulated a rule that *all* minors who commit adult crimes and who would otherwise be sentenced as adults *must* have the opportunity for some discretionary reduction in their sentence by the trial court to account for their youth. Perez's sentence, albeit long, still leaves plenty of time for him to be eligible for parole. It passes constitutional muster.

*Perez*, 154 Cal. Rptr. 3d at 121.

constitutional decision, as here, that effectively freezes the status quo until the next decision.[16]

Appellate judges do not have a monopoly on understanding the problems of youth. The average Iowan surely knows that juveniles are generally less "culpable" than adults. And the complex juvenile justice system that our elected representatives have enacted reflects this. *See* Iowa Code ch. 232 (2013).

Our duty as judges is to leave it to the legislature to determine both crimes and the range of punishments; "culpability" is basically their call. We are authorized to step in only in the rare case, such as mandatory LWOP for juvenile offenders, where the punishment is "cruel and unusual."

**III. The Defendant's Sentence Is Not Unconstitutional Under *Bruegger/Oliver*.**

This then leads to the question whether the sentence is unconstitutional under the proportionality analysis set forth in *State v. Bruegger*, 773 N.W.2d 862 (Iowa 2009), and *Oliver* 812 N.W.2d 636. Pearson is not making a categorical challenge, only an as-applied one.[17] This is a close call for me.

---

[16]After indicating that *Miller* applies to lesser crimes, the concurrence seemingly pulls back and says that the majority opinion "is limited to the bizarre facts of this case." I do not see any such fact-based limitation in the majority's opinion. The concurrence further describes the majority opinion as a "modest, incremental step." I do not believe those words fairly describe an opinion that significantly departs from just-decided United States Supreme Court precedents and that may overturn many existing prison sentences.

[17]As she puts it:

There is no argument that individuals convicted of robbery in the first degree should not be sentenced to an indeterminate term of imprisonment not to exceed twenty-five years[,] that the court can run various sentences as concurrent or consecutive sentences or that, in most instances involving adult offenders, a mandatory minimum sentence of seventy percent is cruel or unusual. . . . As stated above,

We first must decide whether the sentence is "grossly disproportionate" to the crimes. If the sentence does not create an inference of gross disproportionality, no further inquiry is necessary. *Oliver*, 812 N.W.2d at 650. "Our principal task at this stage is to 'balanc[e] the gravity of the crime against the severity of the sentence.' " *Id.* (quoting *Bruegger*, 773 N.W.2d at 873). "[I]t is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.*

Although it is a close question, I am unable to reach the conclusion that the sentence is so grossly disproportionate to the crimes committed as to be *unconstitutional* under *Oliver* and *Bruegger*. Pearson was an active participant in two separate home invasions with guns. While the guns were BB guns, the victims did not know that and the situation easily could have escalated into a deadly scenario. One person suffered a significant injury. Although Pearson did not personally inflict the injury, she was an active participant in both robberies—wielding a gun, confronting the victims, and carrying off items from the homes. Additionally, while Pearson was a juvenile at the time of the crimes, she was close to legal adulthood at the age of seventeen years and three months old. Also, though the record indicates that Pearson had problems with assaultive behavior and anger management as a juvenile, these crimes were not anger-driven. In one of her letters to the court, Pearson admitted that she and Lukinich shoplifted at two stores and

_____

defendant here asserts that the imposition of the seventy percent mandatory minimum sentence under section 902.12, particularly when applied in consecutive terms of imprisonment, is a violation of the cruel and unusual punishment prohibitions as that prohibition is applied to this defendant in this specific instance.

unsuccessfully tried to break into one home before committing the two robberies/burglaries here.

I agree with the court of appeals: "Certainly arguments can be made that the seventy percent mandatory minimum is longer than our society finds acceptable . . . ." *State v. Pearson*, No. 11–1214, 2012 WL 3194101, at *4 n.3 (Iowa Ct. App. Aug. 8, 2012). I also agree with the court of appeals: "but the prerogative to make such a change lies with our legislature [i.e., society's elected representatives]." *Id.*

### IV. Unresolved Questions.

I do not address the separate question, not raised on appeal, whether the consecutive sentences were an abuse of sentencing discretion by the district court. *See, e.g., State v. August*, 589 N.W.2d 740, 745–46 (Iowa 1999) (finding no abuse of discretion in the imposition of consecutive sentences). This is a serious question for me. I also do not address any other matters not raised on appeal. I would simply hold that the Eighth Amendment and article I, section 17 have not been violated.

Waterman and Zager, JJ., join this dissent.

**ZAGER, Justice (dissenting).**

I join with Justice Mansfield's well-reasoned dissent. I write separately to renew my objection to the application of *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), to lengthy term-of-years sentences, also sometimes described as de facto sentences of life without parole. For the reasons set forth in my dissent in *State v. Null*, 836 N.W.2d 41, 84–88 (Iowa 2013) (Zager, J., dissenting), I believe neither *Graham* nor *Miller* apply to Pearson's sentence, and I would affirm the sentence imposed by the district court.